85 F.3d 1023
 UNITED STATES of America, Appellee,
v.
Jose Antonio HERNANDEZ, also known as "Tony"; Mayra Aponte,
Defendants,
Steven Camacho, also known as "Spank," also known as
"Spanko"; Jaime Rodriguez, also known as "Jay";
Antonio Feliciano, also known as "Tony,"
also known as "Guess,"
Defendants-Appellants.
 Nos. 521, 522 and 1079, Dockets 94-1685, 94-1686 and 94-1710.
 United States Court of Appeals,
Second Circuit.
 Argued March 18, 1996.
Decided June 11, 1996.
 
 Michael H. Sporn, New York City, for Defendant-Appellant Steven Camacho.[1]
 Joyce C. London, New York City, for Defendant-Appellant Jaime Rodriguez.
 Carol E. Hofstein, New York City (Lee Ginsberg, New York City, of counsel), for Defendant-Appellant Antonio Feliciano.
 Jonathan D. Schwartz, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney, Nancy J. Northrup, Assistant United States Attorney, New York City, of counsel), for Appellee.
 Before: FEINBERG, CARDAMONE, and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants-appellants Steven Camacho, Jaime Rodriguez, and Antonio Feliciano ("Defendants") appeal from judgments entered November 25, 1994 (Camacho and Rodriguez) and December 20, 1994 (Feliciano) in the United States District Court for the Southern District of New York, John F. Keenan, Judge, that (1) convicted all three Defendants of conspiring to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1), distributing and possessing with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and possessing a firearm with an obliterated serial number that had been shipped in interstate commerce, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B); (2) convicted Camacho and Rodriguez of conspiring to suborn perjury in violation of 18 U.S.C. §§ 371 and 1622, and conspiring to obstruct justice by preventing testimony through threats and intimidation in violation of 18 U.S.C. §§ 371 and 1512(b); and (3) convicted Camacho of possessing in and affecting commerce a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g).
 
 
 2
 Defendants raise various challenges to their convictions and sentences. Specifically, they argue that the district court erred by (1) denying Camacho's pretrial motion to suppress evidence seized by the government during its searches of two apartments used in connection with Defendants' narcotics-related activities; (2) ruling that Rodriguez and Feliciano lacked standing to challenge one of those searches; (3) denying Feliciano's pretrial severance motion; (4) denying Rodriguez's pretrial motion to strike from the superseding indictment as surplusage overt acts of cocaine distribution; and (5) fining Rodriguez in the amount of $10,000. Defendants also contend that (6) the evidence adduced at trial was insufficient to support Rodriguez's convictions for conspiring to suborn perjury and obstruct justice; (7) Congress exceeded its authority under the Commerce Clause when it enacted 18 U.S.C. §§ 922(g)(1) and 922(k); and (8) the Supreme Court's recent decision in Bailey v. United States, --- U.S. ----, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), requires the reversal of their convictions for violation of 18 U.S.C. § 924(c)(1).
 
 
 3
 The government concedes, and we agree, that Bailey requires reversal of Defendants' convictions under § 924(c)(1), but we reject the remainder of Defendants' claims. Accordingly, we affirm in part, vacate in part, and remand for resentencing.
 
 Background
 
 4
 Camacho, Rodriguez, and Feliciano, along with several other coconspirators, were members of the Raja Crew, a heroin-selling organization that operated principally in the Bronx, New York from late 1989 until Defendants were arrested in 1993. Defendants conducted their narcotics-related activities in part out of Apartment 2B at 537 East 139th Street in the Bronx ("Apartment 2B").
 
 
 5
 On July 29, 1991, Judge John Cataldo of the Criminal Court of the City of New York, Bronx County, issued a warrant to search Apartment 2B for, inter alia, heroin, heroin paraphernalia, and guns. Judge Cataldo issued the warrant after making a probable cause determination based upon his (1) review of an affidavit sworn to by New York City Police Department ("NYPD") Detective Donald Sanchez, and (2) examination under oath of a confidential informant (the "CI"). Sanchez's affidavit, which set forth information that had been provided to Sanchez by the CI, stated that the CI had twice been inside Apartment 2B, described the apartment in detail, and described a person named "Joey" engaging in heroin transactions there. When questioned under oath by Judge Cataldo, the CI confirmed the information in the affidavit.
 
 
 6
 Sanchez and other NYPD officers executed the warrant and seized from Apartment 2B drugs, guns, and photographic and documentary evidence linking Defendants to narcotics-related activity. They also arrested coconspirators Jose Crespo and Marie Rosado. With the cooperation of Rosado, agents of the Bureau of Alcohol, Tobacco, and Firearms (the "BATF") were able to identify Defendants. On July 9, 1993, agents of the Federal Bureau of Investigation (the "FBI") arrested Rodriguez and Feliciano.
 
 
 7
 On July 21, 1993, federal agents went to 3312 Hull Avenue, Apartment 4DN, in the Bronx ("Apartment 4DN") to execute an arrest warrant for Camacho. Upon their arrival at 3312 Hull Avenue, the agents located Camacho on the roof of the building and arrested him there. Camacho and the agents returned to Apartment 4DN, where the agents found and seized drug paraphernalia and other evidence.
 
 
 8
 Camacho and the agents gave contradictory accounts of the circumstances of the agents' search of Apartment 4DN. FBI Special Agent David S. Higgins testified at the district court's suppression hearing that Camacho had requested to return to the apartment in order to retrieve his hat. Higgins contended that he had granted Camacho's request because he believed that doing so would increase the likelihood that Camacho would cooperate with the officers. According to Higgins, he and another agent took Camacho into the apartment's master bedroom, where they found a baseball cap and a box of ammunition. Higgins claimed that he had then asked Camacho for permission to search the apartment, and that Camacho had granted such permission. After the officers discovered drug paraphernalia and photographs and documents implicating Defendants, Camacho was asked to sign a consent-to-search form. When he refused, the officers terminated the search.
 
 
 9
 Camacho denied that he had consented to the search and maintained that he had never asked to return to the apartment either to retrieve his hat or for any other reason. In support of his version of the events, Camacho introduced a property invoice from the Metropolitan Correctional Center (the "MCC"), where he was detained following his arrest, which indicated that Camacho did not have a hat with him when he arrived at the MCC.
 
 
 10
 BATF Special Agent Leslie Gee attempted to account for the absence of the hat from the MCC property invoice. Gee testified that he had not been present when Camacho was arrested on the roof, but had entered Apartment 4DN while Camacho and Higgins were in the master bedroom. According to Gee, he guarded the entrance to the apartment until Higgins and Camacho emerged from the bedroom, at which time Gee noticed that Camacho was wearing a baseball cap. Further according to Gee, he mistakenly believed that prisoners were not allowed to wear hats at the MCC, and when he informed the other agents about this belief, one of them removed Camacho's baseball cap and left it in the apartment when they departed with Camacho for the MCC.
 
 
 11
 Following their arrests, and while they were detained and awaiting trial, Camacho and Rodriguez learned that Crespo was cooperating with the government. Crespo testified at trial that Camacho and Rodriguez had sent him a letter requesting that Crespo not testify against Defendants. The letter stated that if Crespo did testify, then he did not care about his family and that he might be found dead some day. Crespo claimed that the letter asked him to sign four accompanying documents, each of which stated falsely that Crespo had been coerced by the government into making false statements against the Defendants. Crespo did not sign the documents.
 
 
 12
 Following a two-week trial, Defendants were convicted of the aforementioned offenses. On November 10, 1994, the district court sentenced Camacho and Rodriguez to twenty-five years imprisonment, to be followed by five years supervised release, and imposed a $10,000 fine and a $350 special assessment upon each of them. On December 14, 1994, the district court sentenced Feliciano to ten years and three months imprisonment, to be followed by five years supervised release, and imposed a $200 special assessment. Defendants are currently serving their sentences.
 
 
 13
 This appeal followed.
 
 Discussion
 
 14
 A. The Search of Apartment 2B.
 
 
 15
 Camacho contends that the district court should have granted his pretrial motion to suppress the evidence seized during the NYPD officers' search of Apartment 2B. Camacho argues that Judge Cataldo's warrant was not supported by probable cause because the information provided by the confidential informant--the sole evidence on which the probable cause determination was based--was not corroborated by an independent police investigation.
 
 
 16
 On an appeal from the denial of a motion to suppress, we review de novo the legal determination of whether there existed probable cause for a search warrant. See United States v. Smith, 9 F.3d 1007, 1011 (2d Cir.1993). In the case of a warrant supported by information obtained from a confidential informant, we examine the "totality of the circumstances" bearing upon the reliability of that information. See Illinois v. Gates, 462 U.S. 213, 230-31, 103 S.Ct. 2317, 2328-29, 76 L.Ed.2d 527 (1983); Smith, 9 F.3d at 1012.
 
 
 17
 In the present case, Judge Cataldo's probable cause determination was based upon the detailed, specific, and sworn testimony of the confidential informant. The CI testified as to events that he claimed to have witnessed first-hand. Here, as in Smith, the CI "corroborated his allegations that the Apartment was used as a retail location for narcotics sales by describing in detail the Apartment, its occupants, and the purchase transactions." 9 F.3d at 1013. In fact, the CI's allegations are significantly more reliable in this case than in Smith because the CI testified under threat of the criminal sanction for perjury. We think that such "[a] detailed eye-witness report of a crime is self-corroborating; it supplies its own indicia of reliability." United States v. Elliott, 893 F.2d 220, 223 (9th Cir.) (internal quotation omitted), modified, 904 F.2d 25 (9th Cir.), cert. denied, 498 U.S. 904, 111 S.Ct. 268, 112 L.Ed.2d 224 (1990); see also Smith, 9 F.3d at 1013 (citing Elliott ). Accordingly, we conclude that the warrant to search Apartment 2B was supported by probable cause.
 
 
 18
 Even if we were to accept Camacho's contention that the CI's testimony was insufficient to establish probable cause, however, the subsequent reliance on the warrant by NYPD officers was objectively reasonable. Thus, the evidence found in the apartment would in any event have been admissible under the "good-faith" exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897, 922-23, 104 S.Ct. 3405, 3420-21, 82 L.Ed.2d 677 (1984); Smith 9 F.3d at 1015-16.
 
 
 19
 B. The Search of Apartment 4DN.
 
 
 20
 We also reject Camacho's argument that the search of Apartment 4DN was illegal. It is well settled that a warrantless search does not violate the Fourth Amendment if "the authorities have obtained the voluntary consent of a person authorized to grant such consent," United States v. Elliott, 50 F.3d 180, 185 (2d Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996), and that "[s]o long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search," United States v. Garcia, 6 F.3d 418, 422 (2d Cir.1995). In the present case, it is clear that if we accept the version of the events described at the suppression hearing by Special Agents Higgins and Gee, then the search of Apartment 4DN was reasonable and consistent with the requirements of the Fourth Amendment. The question on appeal, therefore, is whether the district court erred in crediting Higgins and Gee's version of the events.
 
 
 21
 In reviewing the denial of a motion to suppress following an evidentiary hearing, we will uphold the district court's factual findings unless they are clearly erroneous. See United States v. Hernandez, 5 F.3d 628, 632 (2d Cir.1993). We view the evidence presented at the hearing in the light most favorable to the government. See id. at 633. We review de novo the district court's ultimate legal determinations. Ornelas v. United States, --- U.S ----,---- - ----, 116 S.Ct. 1657, 1662-63, 134 L.Ed.2d 911 (1996).
 
 
 22
 We are satisfied that there was no clear error here, as we have no basis for second-guessing the district court's assessment of the witnesses' credibility. See United States v. Trzaska, 859 F.2d 1118, 1121 (2d Cir.1988), cert. denied, 493 U.S. 839, 110 S.Ct. 123, 107 L.Ed.2d 84 (1989). The district court was confronted with two differing accounts regarding whether Camacho consented to the search, "was free to reject [the defendant's] testimony and accept the agent[s'], and did so." United States v. Villegas, 928 F.2d 512, 518 (2d Cir.), cert. denied, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991).
 
 
 23
 Our conclusion that the search was consensual moots Rodriguez and Feliciano's Fourth Amendment challenge to it. Thus, we need not review the district court's conclusion that Rodriguez and Feliciano had no objectively reasonable expectation of privacy in Apartment 4DN and therefore lacked standing to challenge the lawfulness of the search at that location.
 
 
 24
 C. Feliciano's Severance Motion.
 
 
 25
 Feliciano contends that the district court should have granted his pretrial motion for severance of his trial from that of Camacho and Rodriguez. Feliciano argues that the introduction of evidence concerning his codefendants' attempt to intimidate Crespo had a prejudicial spillover effect on him, thereby depriving him of a fair trial.
 
 
 26
 Rule 14 of the Federal Rules of Criminal Procedure allows a district court to order the severance of defendants charged with jointly undertaken criminal activity "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants ... for trial together." We have noted that "there is a preference, in the federal system, for the joint trial of defendants indicted together," United States v. Rosa, 11 F.3d 315, 341 (2d Cir.1993), cert. denied, --- U.S. ----, ----, 114 S.Ct. 1565, 1864, 128 L.Ed.2d 211, 485 (1994), and accordingly have held that we will reverse a district court's denial of a severance motion only if a defendant can "show prejudice so severe that his conviction constituted a miscarriage of justice, and that the denial of his motion constituted an abuse of discretion," id. (citations omitted).
 
 
 27
 We conclude that the introduction of evidence of the attempt to intimidate Crespo did not prejudice Feliciano's trial. The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require a new trial. See United States v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir.1993); United States v. Chang An-Lo, 851 F.2d 547, 556-57 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). Rather, to prevail in this case, Feliciano must demonstrate that the evidence introduced against Camacho and Rodriguez in some way affected the jury's ability fairly and rationally to evaluate the evidence of Feliciano's guilt.
 
 
 28
 Feliciano has not made that showing. The crimes for which Camacho and Rodriguez were alone charged were adequately distinct from the crimes of which Feliciano was accused so that the evidence relating to each could be presented without any confusion or spillover effect. See Chang An-Lo, 851 F.2d at 556. Additionally, the district court instructed the jury that it was required to consider the evidence against each defendant individually for each count. See id. at 556-57; United States v. Losada, 674 F.2d 167, 171 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Under these circumstances, Feliciano's claim of prejudicial spillover must be rejected.
 
 
 29
 D. Rodriguez's Motion to Strike Overt Acts.
 
 
 30
 Rodriguez challenges the district court's denial of his pretrial motion to strike as surplusage two overt acts of cocaine distribution from Count One of the superseding indictment, which charged Defendants with conspiring to distribute and possess with intent to distribute heroin.
 
 
 31
 We have cautioned that "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.' " United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir.1990) (quoting United States v. Napolitano, 552 F.Supp. 465, 480 (S.D.N.Y.1982)). Defendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy, and it also tended to establish the nature of the relationship between Defendants and their supplier of heroin, defendant Jose Antonio Hernandez. See Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts" is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."); United States v. Towne, 870 F.2d 880, 886 (2d Cir.) ("[E]vidence of uncharged criminal activity is [admissible] ... if it arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.") (internal quotation omitted) (some alterations in original), cert. denied, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); United States v. Percy, 765 F.2d 1199, 1204 (4th Cir.1985) (prior drug transactions admissible to show that defendant's acts were "not inadvertent, accidental, unintentional or without guilty knowledge") (internal quotation omitted). Accordingly, the district court correctly denied Rodriguez's motion to strike. See United States v. Montour, 944 F.2d 1019, 1026-27 (2d Cir.1991).
 
 
 32
 E. Sufficiency of the Evidence.
 
 
 33
 Rodriguez challenges the sufficiency of the evidence supporting his convictions for both conspiracy to suborn perjury and conspiracy to obstruct justice. A defendant challenging a conviction on sufficiency grounds bears a heavy burden. See United States v. Jespersen, 65 F.3d 993, 998 (2d Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1571, 134 L.Ed.2d 669 (1996). The reviewing court must consider the evidence in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.
 
 
 34
 As outlined earlier, Crespo testified at trial that Camacho and Rodriguez had sent Crespo a letter asking Crespo to testify falsely and requesting that Crespo retract his earlier statements against Defendants. Crespo testified that he interpreted the letter as containing veiled threats against him and his family. Because we are required to resolve any issue regarding Crespo's credibility in favor of the government, see id., and because a rational jury could have concluded that Camacho and Rodriguez communicated threats to Crespo, we hold that Crespo's testimony was sufficient to support the jury's finding that Rodriguez and Camacho conspired to suborn perjury and to obstruct justice by means of threat and intimidation.
 
 
 35
 F. Congressional Authority to Enact 18 U.S.C. §§ 922(g)(1) and (k).
 
 
 36
 Relying upon United States v. Lopez, --- U.S. ----, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court struck down as exceeding Congress' Commerce Clause authority a statute that banned the possession of guns within 1,000 feet of a public, parochial, or private school, Camacho argues that Congress exceeded its authority under the Commerce Clause when it enacted §§ 922(g)(1) and 922(k). We have already rejected such a challenge to § 922(g), which requires the prosecution to prove, inter alia, that the offending firearm was "shipped or transported in interstate or foreign commerce" or was "possess[ed] in or affecting commerce." 18 U.S.C. § 922(g). In United States v. Sorrentino, 72 F.3d 294, 296 (2d Cir.1995), we noted that § 922(g) "avoids the constitutional deficiency identified in Lopez because it requires a legitimate nexus with interstate commerce." Compare United States v. Carter, 981 F.2d 645, 647 (2d Cir.1992) ("In the context of firearm control, it is well established that for a firearm to fall within the Commerce Clause, it need only have travelled previously in interstate commerce."), cert. denied, 507 U.S. 1023, 113 S.Ct. 1827, 123 L.Ed.2d 456 (1993), with Lopez, --- U.S. at ----, 115 S.Ct. at 1631 ("[Section] 922(g) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."). This reasoning applies to § 922(k) as well, for that provision requires the prosecution to prove that the firearm in question "has, at any time, been shipped or transported in interstate or foreign commerce." Given the statutorily required nexus between interstate commerce and the firearms possessions prohibited by §§ 922(g)(1) and 922(k), we conclude that Congress acted within its constitutional authority when it enacted these provisions.
 
 
 37
 G. The $10,000 Fine Imposed upon Rodriguez.
 
 
 38
 Rodriguez challenges the district court's imposition of a $10,000 fine to be paid out of the money Rodriguez earns while in prison. Rodriguez relies upon United States Sentencing Guideline § 5E1.2, which provides in pertinent part:
 
 
 39
 (a) The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.
 
 
 40
 ....
 
 
 41
 (f) If the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required ... or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine. In these circumstances, the court shall consider alternative sanctions in lieu of all or a portion of the fine, and must still impose a total combined sanction that is punitive. Although any additional sanction not proscribed by the guidelines is permissible, community service is the generally preferable alternative in such instances.
 
 
 42
 Because Rodriguez failed to object to the fine below, we review his claim for plain error. See United States v. Keppler, 2 F.3d 21, 23-24 (2d Cir.1993).
 
 
 43
 We have authorized the assessment against an indigent defendant of a limited fine to be paid out of his likely prison earnings. See United States v. Fermin, 32 F.3d 674, 682 n. 4 (2d Cir.1994) (collecting cases), cert. denied, --- U.S. ----, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995). Despite his present inability to pay the fine, we have no reason to believe that Rodriguez will be unable to work while incarcerated. Nor do we think that a fine of $10,000 to be paid over the course of twenty-five years of incarceration is unreasonably high. See United States v. Williams, 996 F.2d 231, 234 (10th Cir.1993) (" 'On average, Federal inmates that work can earn $1,000 a year ....' " (quoting Administrative Office of the U.S. Courts, Bringing Criminal Debt into Balance: Improving Fine & Restitution Collection 17 (1992))); cf. United States v. Wong, 40 F.3d 1347, 1382-83 (2d Cir.1994) (vacating fines of $250,000 imposed upon indigent defendants), cert. denied, --- U.S. ----, ----, --- U.S. ----, 115 S.Ct. 1968, 2568, 116 S.Ct. 190, 131 L.Ed.2d 858, 820, 133 L.Ed.2d 127 (1995). Accordingly, the district court's imposition of the $10,000 fine upon Rodriguez did not constitute plain error.
 
 
 44
 H. The Convictions under 18 U.S.C. § 924.
 
 
 45
 Finally, Defendants argue, and the government concedes, that Bailey v. United States, --- U.S. ----, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), requires the reversal of Defendants' convictions and sentences under 18 U.S.C. § 924(c)(1), which penalizes anyone who, "during and in relation to any ... drug trafficking crime ..., uses or carries a firearm." Bailey held that to sustain a conviction for "use" of a firearm under that provision, there must be "evidence sufficient to show an active employment of the firearm by the defendant." --- U.S. at ----, 116 S.Ct. at 505. The government concedes that the § 924(c)(1) convictions in this case must be vacated because there was no evidence in this case of "use" as defined in Bailey, and Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), precludes affirmance of these convictions on a theory that the firearms were "carrie[d]."
 
 
 46
 In sentencing Defendants for their violations of § 924(c)(1), the district court imposed the mandatory five-year consecutive sentences required by that provision. See 18 U.S.C. § 924(c)(1). However, limitations on double-counting prevented the district court from enhancing Defendants' narcotics-related sentences for the possession of firearms while simultaneously imposing consecutive sentences for violations of § 924(c)(1). See USSG § 2K2.4 comment. (n.2) ("Where a sentence [for a violation of § 924(c)(1) ] is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of a[ ] ... firearm ... is not to be applied in respect to the guideline for the underlying offense."); United States v. Howard, 998 F.2d 42, 48 (2d Cir.1993).
 
 
 47
 Accordingly, the government asks that we remand for resentencing on Defendants' convictions for conspiring to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1) and distributing and possessing with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), in order to afford the district court the opportunity to consider the applicability to those offenses of USSG § 2D1.1(b)(1) (requiring increase of two offense levels "[i]f a dangerous weapon (including a firearm) was possessed" in connection with specified narcotics offenses).[2] It is clear that such a remand for resentencing is appropriate when a § 924 conviction is reversed in light of Bailey. See, e.g., United States v. Vasquez, 85 F.3d 59, 61 (2d Cir. May 22, 1996); United States v. Bermudez, 82 F.3d 548, 550 (2d Cir.1996); United States v. Giraldo, 80 F.3d 667, 677 (2d Cir.1996).
 
 Conclusion
 
 48
 The convictions on count three (§ 924(c) violation) are vacated, the convictions on the remaining counts are affirmed, and the case is remanded to permit the district court to consider resentencing.
 
 
 
 [1]
 We have received a letter dated May 20, 1996 from Camacho, long after the oral argument of this appeal, complaining that Sporn provided him with ineffective assistance at trial, and advising the Court that Camacho has "been attempting to have new appellate counsel appointed." Under our rules, "[w]hen a defendant convicted following trial wishes to appeal, trial counsel, whether retained or appointed, is responsible for representing the defendant until relieved by the Court of Appeals." 2d Cir. R. § 4(b)(a). Further, Camacho's only specific complaint is that Sporn is disqualified to pursue the argument concerning ineffectiveness of trial counsel, an issue that ordinarily may not be pursued on direct appeal because the trial record will be inadequate for the resolution of the issue. See United States v. Matos, 905 F.2d 30, 32 (2d Cir.1990); United States v. Cruz, 785 F.2d 399, 404 (2d Cir.1986). In addition, a failure to raise the issue on this appeal will not bar a future application for relief on that ground. See Billy-Eko v. United States, 8 F.3d 111, 113-15 (2d Cir.1993). Accordingly, we have proceeded to decide this appeal on the record, briefing, and oral argument as it presently stands
 
 
 [2]
 The government stipulates that it will not seek a total sentence for Camacho or Rodriguez greater than that originally imposed, a possible outcome under the Sentencing Guidelines in this case